Good morning. May it please the Court. My name is Veronica Manolio, and I represent the appellants, Nelcela Inc., Len Campagna in his marital community, and Alec Dollarhide in his marital community. Let me start by saying I agree with the first set of lawyers. This Court's going to do what it wants to do. Oh, good. But I hope the Court will recognize that the issues in this case require severe action by this Court. And I know you've read our briefs. I know you're intimately familiar with what I've argued, so I'm not going to regurgitate for you. What I'm going to ask the Court to do is indulge me. I've been racking my brain for a few days trying to think of an illustration that will explain to this Court exactly why I'm asking for a remand of some issues and dismissal of others. The way that I view this case is something everyone's familiar with, building a house. In order to have a very solid house, you have to have a solid foundation. If you have a giant crack in your foundation, it does not matter what kind of house you build. Ultimately, that house is going to be compromised. What happened in this case in our Phase 1 is a huge crack in the foundation of the case. In Phase 2... And why is that? Because the Court ultimately let the jury, the Phase 1 jury, decide an issue of copyright ownership without regard to the law on analytic dissection, without doing any analysis whatsoever on whether any elements were protected or copyrightable as a matter of law. Wasn't that essentially, if that were error, wasn't that essentially trumped by the settlement as between Nelsela and Lexel? It should have been, Your Honor, and had it been properly addressed by the Court, we wouldn't be standing here, because here's what happened. You're right. The Lexel and Nelsela settlement removed all the copyright issues from the case. They removed the fact that two parties were fighting over what elements in common could be protected by copyright. Unfortunately, against my urging, strong urging, and multiple motions, the Court allowed the Phase 2 jury to continue to hear the rulings that were made in Phase 1 prior to the determination on analytic dissection. What the Court did in Phase 2 was allow the jury to hear, this case has already been heard by one jury. The Court has already made a ruling of law that the two softwares are similar beyond random chance and that copying took place. The Court instructed the Phase 2 jury that Lexel and not Nelsela were, had ownership rights. All of those allowed the Phase 2 jury to rely on that crack in the foundation. And I wish, Your Honor, that you were, you know, your situation were correct and that the settlement between Nelsela and Lexel would have made the judge do what we asked on several occasions, which is remove the copyright instructions. Remove the findings of copyright. Number one, they're erroneous as a matter of law. Number two, they're going to confuse the jury in Phase 2. Kagan. Kagan. If we were assuming you're right now on this, and assuming this was erroneous information and erroneous instructions given to the jury, the question then whether there is sufficient evidence of fraud on the record, entirely independent of this, to basically make whatever error there is harmless. Two responses to that. Number one, that can't be done independent of the ownership issue because the post parties relied specifically on ownership as one element of their fraud claim. Their fraud claim specifically said Nelsela tried to sell us something they didn't own. They were not the owners. So the ownership became inherent. But more important, you're right that this Court de novo can just look at the evidence and say, even if we remove the ownership element, they have, excuse me, post has put forward that they were also defrauded because my client intended to defraud them. That's an essential element of fraud. The undisputed evidence from my client, Len Campagna, who testified in deposition in that trial is, I didn't know there was any cloud on the ownership issue. I've been ---- Can I ask you this? Absolutely. Did you, on behalf of your client, ask the district court in the Phase 1 trial to conduct an analytic dissection? In the Phase 1 trial, yes. You did? Yes, absolutely, Your Honor. And where is that in the record? Multiple times. In fact, Your Honor, post concedes in their motion, in their answering brief, that we did indeed do it. Their complaint was we did it too late. But during the course of Phase 1, first we filed a motion for clarification of what issues would be tried. That is at the docket at 461. It's in my ER, my excerpt of the record, Volume 3, Tab 53. Volume 3 what? I'm sorry. Volume 3, Tab 53. 63? 53. 53, yes, sir. Okay. Then during the trial or, excuse me, prior to trial, we made an oral argument, again asking the judge to clarify where is the copying that you found. You've told us that you found copying. We need to know where it is. That was done at docket 412. It's ER, Volume 5, sir, Tab 78. We then had another oral argument on the software that would be at issue in the trial. It's at ER, Volume 3, Tab 52. ER, Volume 1, Tab 4. We then gave the court a proposed form of verdict, a proposed modified summary of claims, and a proposed copyright instruction, all that would have accounted for analytic dissection. Then during the course of the Phase 2 trial, or excuse me, the Phase 1 trial, I apologize, answering your question, we specifically raised the Apple case, analytic dissection, and judgment as a matter of law on the record. It's at ER, Volume 1, Tab 5. During the course of the trial, and I'll admit 100%, late, sure. Erroneous, no. Number one, it wasn't our burden. It was always the plaintiff's burden. We were the defendants in the case defending copyright. Number two, we raised it absolutely multiple times prior to the jury being charged on determining ownership. The court heard our oral argument, took the night, went home, read Apple. We all came back in the morning and discussed it. We again made another oral argument that Apple be applied, and I apologize, I didn't give you the JMOL, which was in my Volume 1, Tab 5. And the oral motion is also in Volume 1 at Tabs 5 and 6. We asked the judge very specifically, do not charge this jury on getting an ownership determination until analytic dissection can be. All these record references, are any of these record references something that you did prior to the beginning of the trial, Phase 1? Yes, ma'am. I will admit completely that prior to the trial, we did not utter the words analytic dissection. We didn't use those exact words. Here's what we did. We've been fighting. Remember, we got sued in 2002 by MTSI, who was the first plaintiff. We'd been fighting with the court and MTSI for years. Tell us what you think we took. It culminated in a 2005 hearing, which was in March of 2005, in front of the district court, where we said, my clients have 14 copyrights. These people sued us for infringement and won't tell us what we are allegedly infringing. Of the 14 copyrights, which is it? And MTSI's lawyer stood up with a disc in his hand and said, it's whatever's on this disc. And we said, what is that? And the judge said, you have to identify what's on the disc. In fact, her words, and I remember them specifically, I think you're being a little disingenuous or half-hearted, one of the two she used. MTSI, you need to identify what software is at issue. After she ordered MTSI to finally tell us, that's when Lexell intervened. And when Lexell intervened, we did the same thing. Tell us what's at issue. The judge said, everyone take your software, give it to experts. If there's similarity, we're going to go forward. That's what happened. So on summary judgment, when she says there's similarity, she never does a distinction as to what programs they're in, how much it is qualitatively, quantitatively, excuse me. She doesn't do any analysis other than to say, the experts say there's some similarities, no filter. So to answer your question, without uttering the specific words analytic dissection, yes. We filed our motion for clarification of issues. And the specific clarification. Prior to trial. Well, prior to trial, yes, ma'am. And gave instructions to the jury that would have comprised this, so that this is an issue of law for the judge, actually. Absolutely. Absolutely. We did it on a motion for clarification. We did an oral argument on the software that was going to be introduced at trial. And it wasn't enough that the judge addressed this post hoc after the Phase I trial? It wasn't, Your Honor, because what happened when she addressed it after the Phase I trial, she actually applied analytic dissection and removed significant portions of code. What the court found when the test was finally applied was a large majority of the code was due to external constraints, standard programming functions, and the need to comply with visa regulations. So she told Lexel at Phase II trial, you're going to get thin protection. Thin protection. Right. The most limiting. And you have to prove to the jury virtually identical copying in order to win on infringement. Well, when Lexel and Nelsela settled, we thought infringement is out of the case. So we go back to the judge and said, we need modified instructions. We need to give you a new proposed statement of the case. We did that. What the judge did, unfortunately, is said, I'm not going to regard an infringement case, but I'm going to let the post parties rely on the ownership verdict from Phase I. And she did. In Phase II, she basically removed the entire analytic dissection that she had taken a year to perform after multiple briefings. The next issue that led to significant error was, although we had been in this case at this point, the second trial was held in 2009, we'd been in this case for seven years. And in seven years, all we'd been arguing about was ownership and or analytic dissection. But look, can I just ask for one second? Absolutely. The Lexel-Nelsela settlement, what impact, if any, does that have on the analytic dissection argument? Does it render it moot? It does render it moot. Here's what happened, in my opinion. The Lexel-Nelsela settlement, it renders the infringement moot. Right, infringement, right. It renders the infringement moot. What happens when those two parties say, we no longer have claims against each other, then if you're not claiming infringement, why does it matter who owns what? Lexel, you can own yours. Nelsela, you can own yours. And you're free to do with it whatever you want, because no one other than Lexel could claim we infringed. Because by this time, the post parties and MTSI had all settled together, and they agreed only Lexel owned anything. They never thought post owned it or MTSI owned it. No one was asserting ownership other than Lexel. So when Lexel said, I no longer care whether you own it or not to Nelsela, we believe that's a moot issue. And in fact, the Court asked us to file joint position papers on what our – what we thought the impact of the settlement would be. And we specifically told the Court, we think the impact is ownership can't be discussed in the Phase 2 trial. It's now irrelevant. And certainly, post can't rely on it as an element of its fraud claims and its other tort claims. And the judge said, no, I disagree. They get to rely on it. And she revived the Phase 1 findings. She revived the ownership determination that the Phase 1 jury found. She revised the fact that she found substantial similarity as a matter of law, without the regard that she had made the more stringent virtual identity test. More importantly, even if we had gone forward with the virtual identity at Phase 2, the judge precluded me on a motion in limine from providing the whole source code. She was only going to let the jury see the 18 pages that were done on analytic dissection. So even if we had applied the whole test, it would not have been given to the jury because they filed a motion in limine to exclude me from the whole. I don't know how you can apply a test that the Court tells you has to be used. Quantitatively, this jury at Phase 2 is going to have to decide how much copying had been done and whether or not that copying was illicit. But I'm going to preclude them from viewing the whole. Well, I don't know how you can implement a virtual identity test and at the same time, deprive someone of their ability to show the amount of code. But what I think is important for this Court to realize is the post parties, in their answering brief, absolutely admit two things. Number one, that when the Court finally did analytic dissection, that it eviscerated the Phase 1 jury verdict. They admit it. Their position is, well, so long as the Phase 2 jury was instructed in light of the analytic dissection, there's no harm, no foul. That's a true statement. But the Phase 2 jury wasn't properly instructed. The Phase 2 jury was instructed to rely on an ownership determination in favor of a party who is no longer in the case. They were instructed to that my clients copied from Lexell. Why is that relevant at this point? It's not an essential element of any of their claims. Kagan. Kagan. You objected to that instruction? Absolutely, Your Honor. And you offered your position was not that the instruction was erroneous, but that there ought be no instruction given as to ownership at all? Absolutely. But wasn't the fraud allegation and the breach of fiduciary obligation allegation, the fraud allegation was you basically sold us a product that you represented was yours, and it wasn't? And two answers, because the fraud and the duty of loyalty are two different parties. Post, Post said you defrauded us by selling us something that had a cloud on ownership. Right. Okay. My client said, without a doubt, we had met with Lexell back in 99 when we met and definitively agreed. No, but the fact of a cloud on the ownership is true even if that cloud was ultimately lifted. But here's the problem, Your Honor. It was lifted before my clients ever met Post. The two parties, Lexell and Nelsella, resolved their differences in May of 1999. But that's an issue that doesn't have anything to do with the analytic dissection issue. In other words, that has to do with representations made by both side and when they were resolved. Sure. The truth of the matter is an entirely different issue. Understood. But when this side says, you told us something that had a cloud on the title, when my client is the only person who testifies, I was the person at that meeting, I sat with Lexell, Carl Kubitz, we agreed, we don't have any problems, you own what you own, I own what I own, we go our own separate ways, in his mind there could be no cloud of title. Lexell didn't raise the issue until six years later when we're already in Federal litigation for three years, which, again, is why all through Phase I I kept arguing the statute of limitations needed to be addressed front and center, not seven years in the litigation where all the parties had spent time and energy and money litigating claims that could have been lost by the statute of limitations. But the reality of the situation is that for a fraud claim, Your Honor, that Post had to prove my client intended to defraud them. If my client believed, subjectively believed, that when he sat in that meeting in May 99 that the issue was resolved, he had no intent not to perform his contract with Post. He didn't defraud them if he truly believed, as he testified he did. Kagan. And this is like the old – this is like a hearsay claim in a way. It's – the issue doesn't come in for the truth of the matter. It goes in for the fact that he understood it. In other words, the analytical section issue is what who – what was appropriately owned, what was copyrightable. But this is, was there a beef about the copyright? And that issue was – in other words, I don't see where the judge weighed in one way or the other. That was the subject of the trial. Was there a beef of the copyright? And that seemed to be true. But that's not true, because the Phase 2 trial was not whether or not there was a beef. The Phase 2 trial solely relied on the jury's instruction, where they kept pointing to the jury's instruction, saying the judge found as a matter of law, like sales copied, bad Nelsela, therefore, intent. That was not proof of intent. My client didn't intend to defraud Post. In fact, the best evidence that my client didn't intend to defraud them is that under Arizona law, you have to have a present intent not to perform for both fraud and misrepresentation. My client intended to perform, and the jury agreed my client performed the contract because the jury awarded my client contract damages. So the fraud claim absolutely lacked the prerequisite intent to try to harm them. Can I go back just for a moment to the impact of the analytic dissection issue? As I understand it, you want us to reverse on this issue. And yet, a jury never reached the question of copying and infringement. So what do we reverse with respect to the copyright infringement claims, based on the analytic dissection? Understood. Let me be very clear here. I don't want the court, the court at this point, doesn't need to reverse the analytic dissection. What this court needs to do is to understand that Phase 2 verdict has to be vacated because that jury was erroneously told to rely on rulings that were made prior to the analytic dissection. So just to be sure I understand your point here. Sure. You're saying you don't have a problem with the Phase 1 verdict? I do have a problem with the Phase 1. The Phase 1 verdict needs to be vacated because it wasn't legally proper. But I don't think that the Phase 1 verdict being vacated alone is sufficient because what happened is the Phase 2 jury relied on the Phase 1 verdict. I do want to reserve time, so I'm going to do my very best to... We'll give you a little more time. I'm really concerned about how the analytic dissection even plays a role in this because the jury didn't get to the question of copying and infringement, and that's what that analytic dissection is all about. So when you come up for rebuttal, keep that in mind because I want to know more of your thinking on that. Fair enough. And, Your Honor, I will be very candid with you. The jury in Phase 2 didn't rely on finding an infringement. I agree with you. Okay. But the jury in Phase 2 absolutely relied on an instruction that ownership had already been determined. They very clearly relied on... What does the analytic dissection have to do with that? Because the analytic dissection said, number one, the Court said, my Phase 1, the Phase 1 verdict is impacted because unless Lexell moves forward and proves ownership of protected elements, protected by copyright, ownership hasn't been proven. Yet in Phase 2, she let them rely on it. Okay. All right. Let's hear then from the other side. Good morning. May it please the Court, my name is Kim DeMarschi and I represent the Appalese in this matter. In 20 minutes, I can't explain all of the facts from two two-and-a-half-week jury trials, but it might help to start with an understanding of the factual basis of the claims on which the jury ultimately awarded MTSI and posed millions of dollars in damages. Because those claims do involve who owned what and what Nelsella did or didn't copy and what representations they made about what they had done with regard to the software. And the factual background is this. Back in 1994, a company called Lexell writes a piece of software that will permit credit card transactions to be processed on a personal computer. And Dollar Hyde worked for them, right? He was a consultant for them. They were writing that software under a contract to the company that became MTSI pursuant to an agreement where MTSI would have a license, Lexell would own the code. There was a parting of ways with a transfer of the source code so that MTSI could use it under that license. And Mr. Dollar Hyde continued to work for MTSI. And during that time, MTSI believed, MTSI was subsequently purchased, and its owners believed, based on what they'd been told by Mr. Dollar Hyde and by the folks they'd purchased the company from, that MTSI owned the software. And they paid him more than a million dollars in compensation over a multi-year period to maintain software that they thought they owned. And that he told them they owned when he left that company to form Nelsella. He said, you own your software, I'll give it back to you, I've got this great new software I've written for Nelsella, please hire my new company. Meanwhile, the new company also went after a new client, and that's Post. And Post was in the market to buy software that would perform this credit card processing function. And there is testimony in the record that they were only interested in buying software that they could have complete control over. They were willing to do a hybrid license purchase where they would license the base code and then they would buy and completely own the customized code. But they were in the market for software that they could possess and control and own with clear title. And clear title was a big issue for them. In fact, such a big issue for them that Mr. Campana actually admitted that he understood it was material. Campana's Dollar Hyde's partner? Campana's Dollar Hyde's business partner. Here comes time for the phase two trial. Lexel settles. That means we don't need a bunch of expert testimony about exactly what the copying was and we don't need to do copyright infringement. But the question of who copied what and when and whether they were allowed to do it and whether they were telling the truth when they represented to MTSI that they'd written their code free and clear and could transfer unencumbered licenses and ownership, that remained relevant. And that's... So in other words, if I can describe it this way, it's like there's a wall down the middle of a bedroom. You've got claim number one on one side of the wall, which is in some respects wholly different than the one on the other side of the wall. The one on this side of the wall is the one about what flows in terms of contracts and what people expected and so on. And I'll call it the contract claim. The contract claim proceeds separately. The ownership issue gets settled over here, but you can't talk about the contract claim to some degree without knowing who owned it. Is that correct? That's right. And that's why bifurcation initially made sense. This is one of those cases, it's like a really mean civil procedure exam. Everyone sued everybody for everything. But at the core of it was everybody claimed that they owned this software or that they'd been lied to about who owned the software. And so why not start with the computer software up front? And what happened is the parties exchanged their software. The experts looked at it. The experts all found copying. And at this point in time, remember that Nelsela... Before the analytic dissection. Before the... This is... No one has said the words analytic dissection. And the reason no one has said the words analytic dissection is that everyone in the case is suing everybody else for copyright infringement. Copyright infringement plaintiffs never mention analytic dissection. It's relevant to a defense. Analytic dissection is something you bring up when you're a defendant and you say, yes, I acknowledge there are similarities, but there's some reason for those similarities that makes them legal. And up until essentially the middle of the phase one trial, no one had ever mentioned that defense. And the reason Nelsela hadn't mentioned that defense is that it was still trying to win its own copyright infringement claims. It was still trying to prove that really all that software had belonged to it, it had written it first, and it was somebody else that had done the copying. And the analytic dissection is strictly a defensive tool for your description, right? Essentially. It's something... It's a way for a person who would otherwise be liable for copyright infringement to excuse the evidence of similarity between the two pieces, in this case, of software. And you heard some argument about the record regarding when analytic dissection came up. I think both sides agree that the first time a reference to analytic dissection was made was mid-trial during the oral Rule 50A motion. That's the point at which Counsel for Nelsela got up, cited the Apple case, said, Your Honor, you needed to make a legal determination about what the copyrightable elements were. Before that, the other record references you were provided were about a different issue. And that's the question of which software is really at issue here. This isn't like when you go to the store and you buy Microsoft Office, and it has Word and Excel and PowerPoint, and we know which one is which. This is software that was written entirely from scratch. And it was a package of software that used a common database and did various functions relating to credit cards. You could call it a single piece of software, you could call it four pieces of software, you could probably call it eight pieces of software. But it's not as though there were really clear dividing lines about what software was what. Lexell had filed copyright applications using certain denominations. Nelsela had filed copyright applications using certain denominations. And there was evidence of copying. At the point summary judgment was litigated, all the software was at issue, because at that point Lexell was in and it was suing for everything. Nelsela was apparently suing for something less than everything, but it was very clear that Lexell was suing for everything, all the software was at issue. Those pretrial filings that you heard about were very late pretrial. These are motions for clarification of triable issues that are in maybe the six months prior to trial. Pre-phase one or phase two? Pre-phase one. But those were not seeking analytic dissection. They were not saying to the court, please look at the copying and separate out what's protectable and what's not protectable. They were saying to the court, wow, there are a bunch of different pieces of software at issue here, and we think you only found copying in one of them, not in all of them. Please clarify that for us so that we can understand what we need to be talking to the jury about and which pieces of software are going to be put in front of the jury at the phase one trial for the jury to make ownership decisions about. And the reason the phase one trial ended up being structured about ownership in the way it was, was largely because of the positions Nelsela had taken at summary judgment. Nelsela hadn't contested copying. Its big argument on summary judgment, its material fact was, yes, there's evidence of similarity, but there's not evidence of who was first. And if you don't know who wrote it first, you can't know who's the copier and who's the copyee. So that's the issue that precludes summary judgment on who owns the software. That's the issue that has to get taken to the trial. And then they're trying to clarify, well, which software pieces is it that the jury's going to figure out were owned first? When mid-trial, Nelsela suddenly says, analytic dissection judge, you're looking at copying of elements that aren't protected. Nelsela put the court in a really difficult position. We were halfway through a jury trial, and we had a charged federal jury that thought they were going to be sitting there, and these are the days they were going to be out of work. The judge really did the best that could be done under the circumstances by going back and doing a complete analytic dissection analysis after the fact. She did not find in that analytic dissection analysis that the substantial bulk of the copying was in unprotected elements. She found that there was a triable issue of fact on the copying of protected elements, but that because this was software that was written for a certain function, there were probably only a certain number of ways you could write the software, and that means you get thin protection, which is protection against verbatim copying. You have some of the evidence of copying in the record before you. It's verbatim copying. It's whole pages, line by line, including discretionary things. Programmers can put little notes to themselves, and there are programmer notes here that are identical between the two pieces of software, but we never had to get into that with the phase two jury because of the Lexel settlement. Really the primary argument that Nelsela has for overturning the phase two trial is that in the face of the Lexel settlement, the district court shouldn't have told the jury what had already happened. And that was clearly their hope in settling the case, that in settling the case, they would somehow be able to unravel everything that had already gone against them, summary judgment finding of copying, the analytic dissection finding that at least some of that copying was a protectable material and there was a triable issue to go. Lexel did not transfer title in the settlement. It's very clear they didn't transfer title in the settlement. It wasn't in the stipulation. And Lexel's principal got up at trial and said, all I did was agree we weren't suing each other anymore. I didn't transfer the software to them. I didn't give them permission to use it now, and I certainly didn't give them permission to use it back in 1999. The information that you heard today about how there was only one witness who had testified about a 1999 conversation, and that that conversation had conclusively resolved any cloud on the title, that's one of the two witnesses who testified to the phase two jury, and those witnesses testified to different things. Mr. Campana got up and said, I let Carl Cubits look at my software, and he said there wasn't any copying, and he apologized to me for accusing me of copying. Carl Cubits got up and said- Cubits is with Lexel. He's Lexel's, yes, he's Lexel's programmer. Carl Cubits got up and said, I remember the same meeting with Len Campana, but I saw copying. I saw evidences of my copyright notices all over their software, and Len Campana promised me they would stop using my software. That meeting is May 1999, which is the same month that Nelsela is turning around a post and saying, we have this great software that we own, and we can transfer a license to you, and we can give you ownership of customized software. But is the point here, the concern that by the judge's, that is a contestable issue of fact, what went on in that conversation. Yes. Is it the case that the instruction that the judge gave with respect to who actually owned the software, resolving that issue of fact, which should have been an issue of fact for the jury? It was an issue of fact that was resolved in Phase I, and an issue of fact that survived analytic dissection. And it's important to look at exactly what the judge said about what the Phase I jury determined. She didn't say anything about infringement. She didn't say anything about copyright. She said, the court has determined the software is substantially similar, just said similar, and the copying took place. And the first jury found that Lexel was the one who was copied from. That's essentially what she tells them. It's a pretty careful instruction. What's interesting about it is that it's an instruction derived in substantial part from the party's joint pretrial order that Nelsela agreed to. Now, Nelsela agreed to it while Lexel was still in the case, but Nelsela agreed that it was an accurate statement of the law of the case after Phase I and analytic dissection. And what they were willing to agree to was the statement that the Lexel 2001 software, MTSI software, and Nelsela software are similar beyond the possibility of random chance as a matter of law and copying took place. And that's an accurate statement of what was found in Phase I. That's not misrepresentative. It's prejudicial in the sense that the Phase I jury found against Nelsela. But that's not the kind of prejudice that's reversed on appeal. That would go to the issue of, say, the cloud on title. It goes to the issue of the cloud on title, though, as Judge Gertner pointed out, neither ownership nor even cloud on title are the only basis for the fraud verdict. There was also a substantial issue of functionality here, namely that the software didn't do what it was supposed to do, and that by not doing what it was supposed to do, it caused millions of dollars of damage to post. It processed the transactions, but so badly that it resulted in millions of dollars of consequential damages. And that would, of course, have had nothing whatsoever to do with the Phase I trial. That's correct. I want to make sure that I talk at least briefly about the statute of limitations issue, because the statute of limitations argument is another one of these, maybe we can solve the fact that the Phase I jury found we were the ones doing the copying, not the other way around. And that's the question Nelsela set up, is who did the copy? The statute of limitations argument only works for Nelsela if by failing to file a copyright infringement case in three years, you give up all your ownership rights and put your work in the public domain. It's the copyright equivalent of adverse possession. There is no adverse possession in copyright law. In fact, there's ample precedent in this circuit that a copyright owner who fails to file promptly an action for infringement can still file years later, it's just their action can only look back the three-year statutory period, and they can only get infringement damages in that period. It's not as though if your copyright was infringed four years ago and you didn't do something, you'd forever lose the copyright. That's the only conceivable remaining relevance of statute of limitations here. There was some discussion of the adequacy of evidence of fraud and specifically the adequacy of evidence of intent. Nelsela's principals, Mr. Campana and Mr. Dollarhide, did not get up on the stand and no one is saying that they did. By and large, fraud defendants don't get up and admit an intent to deceive. The question is whether there are adequate facts from which the jury could infer an intent to deceive. We've laid those out in detail in our brief with record citations to the exact parts of the testimony, but there is ample evidence to conclude that despite their protestations of innocence, that they knew there was a question about their title. They, in fact, Mr. Dollarhide, having written the software, must have known that he was engaged in character-by-character copying of something. I'd like to be able to answer any questions the panel has. There are about five or six other arguments that are in the briefs that we haven't talked about. And I have a few minutes, so if there's anything. Any members of the panel have questions? Yeah, I don't have questions. We have the briefs. I think that the information in the brief is sufficient for me, Judge Gershwin. Yes, it's fine. Very good. I think we then have your presentation and your argument. Thank you very much. And we'll next hear a rebuttal argument. Thank you very much. We took you over before. We're going to give you two minutes max of rebuttal time. OK? I appreciate it very much. Let me start by this. The joint party's factual recitation, not supported by the facts. I know I don't have time to go through the facts. I'm going to ask you and urge you, please look at the briefs. We both cited, to the record, voluminously. And it was 10 years in the making, so it is voluminous, and I apologize. But what this Court needs to understand, first and foremost, they are dead wrong on the law about whose burden it is on a copyright infringement case. This Court, right down the hall in Apple, said it's the plaintiff's burden. Lexell had a duty to list the common elements and features it thought Nassaula was infringing from day one. Lexell failed to meet that burden. For five years, my client was made to defend a ghost. For five years, my client was told, you're doing something wrong, but we won't tell you what it is. Can I just stop you for one minute? Sure. Ms. DeMarchi, I apologize by mispronouncing it, indicated that without having any analytic dissection, that there were experts on both sides who testified, I gather, at some length or in writing, about the fact that there was, in fact, copying. And that at, you know, well before the settlement, that there was, in fact, evidence to that effect. Do you disagree with that? I do disagree with that. What the experts all found is that there were similarities in the codes, absolutely. What the experts never could have done and the first court didn't do in the first phase is decide what of those elements are copyrightable as a matter of law. You can only own, Your Honor, those portions that are copyrightable. So even if there's copying, if it's in elements that aren't protected, it doesn't matter. And the question is whether, even if you're right, and the Phase II jury believes that doesn't get, isn't carefully instructed as to whether this was copying with respect to protected material or not. It's a fraud case. It's a breach of fiduciary obligation case. That, why does it matter at all if I represented to you that I'd done everything. And I, you know, wrote this piece of software myself. And in fact, I had copied protectable or not protectable. I had copied it. I'm still defrauding you in a way that has nothing to do with the bona fides of the copyright claim. It has nothing to do with infringement. I've misrepresented to you that I didn't do what I, in fact, did. So the analytic, the question is the role that analytic deception played in Phase II. And it doesn't seem to me that it played any role in Phase II. Because it was not an infringement case. It was, you made representations to me and you just were wrong. Let me very, very clearly answer that question. And I have to respectfully disagree with your analysis. If I take one of those briefs right there and I copy the front page where it has the heading of this court and everything that's relevant to this court. And then I change the content on the inside and I make it relevant to my arguments and my issues. And then I hand it to Kim DeMarschi and tell her this is my brief. I wrote it. I'm telling the truth. That's what happened here. My client, Alec Dollarhide, who wrote software for Lexel, used the same things that were required in Visa regulations and wrote new software for Nelsela. The things that were in common between your brief and the brief I handed Kim DeMarschi are not protectable elements. The name of this court, the U.S. Ninth Circuit, is not a protectable element. Until Lexel could prove that my client copied protected elements, my client owned everything that was in his brief underneath that front page. And when he met with Post and he said, I own this, he was right. And unless he intended to defraud, which he didn't, that fraud element does not stand. We appreciate the argument. We realize there's lots more that both of you would like to say, but that's the nature of these proceedings. So we thank you both for the argument. The case of Merchant Transaction System Inc. et al. versus Nelsela is submitted. And we stand in recess for the day. Thank you.
judges: Gertner, Gould, Smith M.